IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 21, 2000 Session

## DANA HOPE DAVIS THURMON (SCOTT), INDIVIDUALLY AND AS SURVIVING NATURAL PARENT OF DALTON THURMON, A MINOR , ET AL. v. EDWARD SELLERS, ET AL.

Direct Appeal from the Circuit Court for Shelby County
No. 83012 T.D.      George H. Brown, Jr., Judge

No. W2000-00422-COA-R3-CV - Filed February 16, 2001

This is a personal injury and wrongful death case arising from a collision between a pickup truck and a tractor trailer truck. The five-year-old son of plaintiffs Dana Scott and Shane Thurmon died as a result of the accident. The driver of the car was an "on call" employee of his father's business at the time. The plaintiffs sued the driver of the car and his father, alleging vicarious liability under the doctrine of respondeat superior and under the family purpose doctrine. Plaintiff Dana Scott also sued for consortium-type damages for the loss of her son. Although referring to it as a directed verdict, the trial court, pursuant to Rule 41.02 of the Tennessee Rules of Civil Procedure, entered an involuntary dismissal in favor of the defendants on the vicarious liability issue, under both respondeat superior and the family purpose doctrine, and on the loss of filial consortium claim. The trial court awarded damages, *inter alia*, to Dana Scott for the wrongful death of her son and to Carl Fuhs for personal injuries based upon his negligent infliction of emotional distress claim. We hold the following: (1) employer is not vicariously liable under the doctrine of respondeat superior for acts or omissions of "on call" employee when employee is not acting within the course and scope of his employment; (2) the requirements of the family purpose doctrine were met and defendant Donald Sellers, Sr. is vicariously liable under this theory; (3) parents may recover filial consortium damages in wrongful death actions for the death of their child; (4) the trial court's wrongful death award to Dana Scott was supported by the evidence; (5) Carl Fuhs sufficiently established a claim for negligent infliction of emotional distress; and (6) the personal injury award to Carl Fuhs is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court of Shelby County Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY K. LILLARD, J. and HEWITT P. TOMLIN, JR., SP. J., joined.

Tim Edwards and James F. Horner, Memphis, Tennessee, for the Appellant, Dana Hope Davis Thurmon Scott.

Charles Abbott, Memphis, Tennessee, for the Appellants, Shane Thurmon and Tiffany Thurmon.

Mark Ledbetter, Memphis, Tennessee, for the Appellant, Carl J. Fuhs.

Robert L. Moore and John H. Dotson, Memphis, Tennessee, for the Appellees, Edward D. Sellers and Donald Sellers.

## OPINION

Shortly before noon on September 28, 1996, Donald Edward Sellers, Jr. (Eddie),[1] with passengers Shane Thurmon (Mr. Thurmon) and his five-year-old son, Dalton Thurmon (Dalton), was traveling northbound on Crumpler Road in Shelby County in a 1995 Ford F-150 pickup truck when he approached the intersection of Crumpler Road and Holmes Road. At that time, there were stop signs located at the intersection of Crumpler Road and Holmes Road for traffic proceeding both northbound and southbound on Crumpler Road. Eddie stopped at the stop sign, but then proceeded into the intersection directly into the path of an eighteen-wheeler driven by Carl J. Fuhs (Mr. Fuhs) which was headed westbound on Holmes Road. Mr. Fuhs' semi collided with the pickup being driven by Eddie on its passenger side, causing the pickup to flip numerous times before it settled off of the road. The impact injured Mr. Thurmon and fatally injured Dalton. Eddie admits fault for the accident.

The 1995 pickup truck driven by Eddie was leased by Eddie's father, Donald E. Sellers, Sr. (Mr. Sellers) through Mr. Sellers' business, Donnie's Deli and Amoco. The insurance, gas, and license for the pickup truck was paid through Donnie's Deli and Amoco. Eddie, however, had exclusive control over the pickup truck, using it for errands associated with his business, Cheap Smokes, his father's business, and for personal activities outside of the scope of either of these businesses.

Eddie was a salaried employee of Donnie's Deli and Amoco. He was provided with a cell phone whereby he could be reached in order to run errands for Donnie's Deli and Amoco during the hours of 6:00 a.m. to 11:00 p.m., seven days a week. On the day of the accident, Eddie and Mr. Thurmon were on their way to a golf shop in Memphis so that Mr. Thurmon could look for a set of golf clubs. Eddie was not running any errands for Donnie's Deli and Amoco at the time of the accident; however, Eddie was "on call" and had with him the cell phone provided by Donnie's Deli and Amoco.

The driver of the eighteen-wheeler, Mr. Fuhs, was not related to, nor did he know, any of the individuals in the pickup truck at the time of the accident. Mr. Fuhs witnessed, from a few feet away, Dalton's body slumped over the back seat of the pickup truck and hanging halfway out of the truck's back window. A short while after the accident, Mr. Fuhs went to the doctor complaining of

---

[1] We refer to Donald Edward Sellers, Jr. by his given name for purposes of clarity only, and it is not intended to be disrespectful.

headaches and neck, back, and left knee pain. Mr. Fuhs also sought treatment from a psychologist for anxiety, sleeping problems, and flashbacks relating to the accident. Mr. Fuhs was treated for his medical problems and was diagnosed as having a permanent impairment of 12% to the body as a whole from his physical injuries and of 55-75% to the body as a whole from his mental distress.

Dalton's mother, Dana Hope Davis Thurmon Scott (Mrs. Scott), filed a complaint for wrongful death against Mr. Sellers, Eddie, Mr. Fuhs and his employer at the time, Printco Enterprises, and Shelby County. She later amended her complaint to allege liability against Mr. Sellers based upon the family purpose doctrine. Mrs. Scott amended her complaint a second time to include a claim for loss of consortium. Mr. Thurmon and his present wife filed a complaint against the same defendants for wrongful death, loss of consortium on behalf of Mrs. Thurmon, and damages he sustained in the accident. Mr. Fuhs filed a complaint against Mr. Sellers, d/b/a Donnie's Amoco, Eddie, d/b/a Cheap Smokes, and Shelby County for personal injury and negligent infliction of emotional distress. Prior to trial, all defendants except Mr. Sellers and Eddie were dismissed from the actions filed against them. The three cases were consolidated for trial and were tried before the court, sitting without a jury.

At the close of all proof, the Sellers moved for an involuntary dismissal[2] as to Mr. Sellers on the ground that the plaintiffs had failed to make their case on the claim of vicarious liability. The trial court granted the motion and dismissed Mr. Sellers, finding that Eddie was not using the pickup truck in furtherance of the purpose and with the permission of Mr. Sellers. The Sellers also moved for an involuntary dismissal on Mrs. Scott's claim for loss of consortium of Dalton. The court granted this motion, holding that *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999), did not embrace a claim by a parent for the loss of consortium of a deceased child. Lastly, the Sellers moved for an involuntary dismissal on Mr. Fuhs' claim for negligent infliction of emotional distress, which the trial court denied. The trial court awarded damages to each of the plaintiffs in the following amounts:

| | | |
|---|---|---|
| 1. | To Mrs. Scott on her wrongful death claim | $700,000 |
| 2. | To Mr. Thurmon for his personal injuries | $850,000 |
| 3. | To Mrs. Thurmon for loss of consortium | $25,000 |
| 4. | To Mr. Fuhs for his physical and mental injuries | $275,000 |

Eddie has appealed the verdict as to Mr. Fuhs, and Mrs. Scott and Mr. Thurmon have appealed their respective verdicts. Upon the Sellers' motion, this Court has ordered the appeals consolidated. The issues on appeal, as we perceive them, are as follows:

_____

[2]Although referred to as a "directed verdict" in the record, the Sellers' motion, in essence, was for an involuntary dismissal pursuant to Rule 41.02 of the Tennessee Rules of Civil Procedure because this matter was heard before the court sitting without a jury. Two procedural devices are available during trial to test the sufficiency of evidence. One is a motion for involuntary dismissal, which is used in nonjury actions. The other is a motion for a directed verdict, used in jury trials pursuant to Rule 50.01 of the Tennessee Rules of Civil Procedure. *See Pivnick*, Tenn. Cir. Ct. Proc. (2000 ed.) §§ 24-17, -18; *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821 (Tenn. Ct. App. 1992).

1.    Whether the trial court erred in ruling that Mr. Sellers was not vicariously liable for the acts of Eddie Sellers under the doctrine of respondeat superior and under the family purpose doctrine.

2.    Whether the trial court erred in dismissing Mrs. Scott's claim for loss of consortium.

3.    Whether the amount of the trial court's award for Mrs. Scott for the wrongful death of Dalton Thurmon was against the preponderance of the evidence.

4.    Whether the trial court erred in denying the Sellers' motion to dismiss Mr. Fuhs' claims for negligent infliction of emotional distress.

5.    Whether the trial court's award of damages to Mr. Fuhs was supported by a preponderance of the evidence.

Since this matter was tried before the court sitting without a jury, our review of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). As the issues regard questions of law, our review is *de novo* with no presumption of correctness. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); Tenn. R. App. P. 13(d).

### *Respondeat Superior*

The appellants in this action, Mrs. Scott, Mr. and Mrs. Thurmon, and Mr. Fuhs, state two bases for alleging that Mr. Sellers is vicariously liable for the acts of Eddie Sellers under the doctrine of respondeat superior. The two bases are the presumption of liability created by sections 55-10-311 and 55-10-312 of the Tennessee Code and the fact that Eddie Sellers was an "on call" employee of Donnie's Deli and Amoco at the time of the accident.

In order to impose liability under respondeat superior, it is necessary to show that the operator of a vehicle causing injury was, at the time of the accident, acting as a servant or employee of the owner, was engaged in the employer's business, and was acting within the scope of his employment. *See Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 386 (Tenn. 1986); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). It is undisputed that Eddie was an employee of Donnie's Deli and Amoco. Thus, the pivotal issue is whether Eddie was acting within the course and scope of his employment.

Generally, the phrase "within the course and scope of employment" refers to acts of an employee committed while engaged in the service of the employer or while about the employer's business. *See generally Tennessee Farmers Mut. Ins. Co.*, 840 S.W.2d at 937-38. However, sections 55-10-311 and 55-10-312 of the Tennessee Code provide that proof of ownership and registration of a motor vehicle constitutes prima facie evidence that the vehicle was being operated

for the vehicle owner's use and benefit and within the course and scope of employment.[3] The prima facie case in these two code sections may be overcome by uncontradicted evidence to the contrary coming from witnesses whose credibility is not in issue. *See Haggard v. Jim Clayton Motors, Inc.*, 393 S.W.2d 292, 294 (Tenn. 1965). If the prima facie case is overcome by evidence so strong that reasonable minds could not differ, then a directed verdict for the owner may be proper. *See Hamrick*, 708 S.W.2d at 387.

Generally, the issue of scope of employment is a question of fact, but it becomes a question of law when the facts are undisputed and no conflicting inferences are possible. *See Tennessee Farmers Mut. Ins. Co.*, 840 S.W.2d at 936-37. In cases involving a motion for involuntary dismissal, the trial court "must impartially weigh and evaluate the evidence as it would after the presentation of all the evidence" and it must grant such a motion if the plaintiff has failed to make out a prima facie case. *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 822 (Tenn. Ct. App. 1992). On review, we need only determine whether the evidence makes out a prima facie case. *See id.*

At trial, the certificate of title for the 1995 pickup truck was introduced, which showed the owner of the vehicle as FMCC % Donald E. Sellers.[4] Testimony deduced at trial established that the Donald E. Sellers named as owner of the truck was Mr. Sellers, Eddie's father. Based upon this evidence alone, a prima facie case was established under sections 55-10-311 and 55-10-312 of the Tennessee Code. Additionally, the plaintiffs established that the pickup truck driven by Eddie on the day of the accident was leased through Donnie's Deli and Amoco and that

---

[3]Section 55-10-311(a) of the Tennessee Code states, in relevant part that

[i]n all actions for injury to persons . . . caused by the negligent operation or use of any automobile, auto truck, motorcycle, or other motor propelled vehicle within this state, proof of ownership of such vehicle shall be prima facie evidence that the vehicle at the time of the cause of action sued on was being operated and used with authority, consent and knowledge of the owner in the very transaction out of which the injury or cause of action arose, and such proof of ownership likewise shall be prima facie evidence that the vehicle was then and there being operated by the owner, or by the owner's servant, for the owner's use and benefit and within the course and scope of the servant's employment.

Tenn. Code Ann. § 55-10-311(a) (1999).

Section 55-10-312 of the Tennessee Code provides that

[p]roof of the registration of the motor-propelled vehicle in the name of any person shall be prima facie evidence of ownership of the motor propelled vehicle by the person in whose name the vehicle is registered; and such proof of registration shall likewise be prima facie evidence that the vehicle was then and there being operated by the owner or by the owner's servant for the owner's use and benefit and within the course and scope of the servant's employment.

Tenn. Code Ann. § 55-10-312 (1999).

[4]Mr. Sellers leased the 1995 Ford F-150 pickup truck through Ford Motor Credit Company for Eddie Sellers' use.

the insurance, gas, and license for the pickup was paid through Mr. Sellers' business. However, uncontradicted countervailing evidence exists in the record. Mr. Thurmon, as well as Eddie, testified that the purpose of the trip was to drop off some golf clubs at Mr. Thurmon's father's house and then to go to Memphis to look for golf clubs for Dalton. Furthermore, Mr. Thurmon testified that once Eddie came to get them, they never stopped by Donnie's Deli and Amoco before going about their personal business.

Although the plaintiffs in the instant case were able to establish a prima facie case under sections 55-10-311 and 55-10-312 of the Tennessee Code, the prima facie case was sufficiently overcome by the uncontradicted testimony of Mr. Thurmon and Eddie which established that Eddie Sellers was using the pickup truck solely for his own personal endeavors. Accordingly, we find that Mr. Sellers cannot be held liable under the theory of respondeat superior as it is based on sections 55-10-311 and 55-10-312 of the Tennessee Code. Thus, we affirm the trial court's ruling on this issue.

The plaintiffs next argue liability under the doctrine of respondeat superior based upon Eddie's being an "on call" employee of Mr. Sellers' business, Donnie's Deli and Amoco. This scenario presents an issue of first impression in Tennessee. Thus, for guidance, we shall consider the reasoning and analysis of similar cases from courts in sister jurisdictions.

In the cases dealing with the issue of vicarious liability for an "on call" employee that this Court reviewed, the underlying principle is that the mere fact that an employee is "on call" does not automatically give rise to employer liability.[5] Rather, an employee's "on call" status gives rise to a question of fact as to whether the employee was acting within the scope of his employment at the

---

[5] *See Evans v. Dixie Fasteners*, 290 S.E.2d 172, 174 (Ga. Ct. App. 1982) (Being on call 24 hours a day does not necessarily mean employee was in the service of his employer when collision occurred); *Herndon v. Neal*, 424 So. 2d 1180, 1182 (La. Ct. App. 1982) (An informal "on call" situation does not mean the employee is within the course and scope of his employment every second of every day); *Clickner v. City of Lowell*, 663 N.E.2d 852, 855 (Mass. 1996) (The mere fact of being on call does not place employees within the scope of their employment); *Medina v. Fuller*, 971 P.2d 851, 855 (N.M. Ct. App. 1998) (The test for liability for an on call employee asks exactly what the employee was doing at the time of the injury-producing accident); *Ehlenfield v. State*, 404 N.Y.S.2d 175 (1978), *appeal denied*, 380 N.E.2d 336 (The fact that an employee is constantly "on call" is not sufficient to cast his employer in liability); *Hantke v. Harris Mach. Works*, 54 P.2d 293, 296 (Or. 1936) (The mere fact that an employee is on call does not render his employer liable); *Melnick v. Neuman*, 1981 WL 139201, at ***3 (Wis. Ct. App. Sept. 22, 1981) (The fact that an employee is on call is merely one factor to be considered by the trier of fact in determining whether an employee is within or outside the scope of his employment).

time of the accident.  ***See Gullett by Gullett v. Smith***, 637 N.E.2d 172, 175 (Ind. Ct. App. 1994).[6] As the court reasoned in ***Le Elder v. Rice***, 26 Cal. Rptr. 2d 749 (1994):

> Public policy would be ill-served by a rule establishing 24-hour employer liability for on-call employees, regardless of the nature of the employee's activities at the time of an accident.  Respondeat superior is imposed for three policy reasons: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." [citations omitted] None of these goals would be legitimately accomplished by a rule establishing automatic 24-hour employer liability for 24-hour on-call employees. First, employer liability would not prevent a recurrence of the tortious conduct because an employer has no right to control the purely personal conduct of an employee.  Second, although the deep pocket of an employer might give greater assurance of compensation for the victim, that desired economic end would be achieved inequitably because the victim's losses would not be borne by the person who benefitted from the injury-producing activity.  Modern technology has changed the means by which we communicate.  Beepers, pagers, facsimile machines and cellular phones keep us literally at a fingertip's distance from one another.  But on-call accessibility or availability of an employee does not transform his or her private activity into company business.  The first question must always focus on scope of employment.  Where the injury-producing activity is beyond that scope, no totality of other circumstances will result in respondeat superior liability.

***Id.*** at 753.  ***See also Pruden v. United States***, 399 F. Supp. 22, 27 (E.D.N.C. 1973) ("It would be grossly unfair to hold an employer liable for all actions of his employees while they were off duty and on personal missions, even if they were subject to call, unless of course they were called or were performing a specific service for their employer while on call.").

In ***Johnson v. Dufrene***, 433 So. 2d 1109 (La. Ct. App. 1983), the Louisiana Court of Appeals instructed that, in situations where an injury is caused by an employee's negligence while operating his employer's vehicle, the cases must be decided upon their own facts with important consideration given to whether, at the time of the accident, the use of the vehicle was benefitting the employer, the employee was subject to the employer's control, and the use of the vehicle was authorized by the employer. ***See id.*** at 1112.  Furthermore, in ***Thomas v. Travelers Insurance Company***, 423 S.W.2d 359 (Tex. App. 1968), the Texas Civil Court of Appeals held that an "on call" employee must be

---

[6]***See also Pruden v. United States***, 399 F. Supp. 22, 25, 26 (E.D.N.C. 1973), ***aff'd***, 511 F.2d 1398 (4th Cir. 1975) (Two factors are key in situations involving "on call" employees, namely, the amount of control the employer has over the employee at the time of the act and whether the employer's business was being substantially furthered at the time of the accident); ***Connell v. Carl's Air Conditioning***, 634 P.2d 673, 674-75 (Nev. 1981) (holding that the employer was not liable for negligence of 24-hour "on call" employee who was not called for duty and whose after hour activities were not restricted, despite fact that employer was responsible for payments and maintenance of employee's personal car, because employee was not acting within the course and scope of his employment).

engaged in or about the furtherance of the business of his employer in order to be within the scope of his employment and thus be able to cast liability upon his employer. ***See id.*** at 360.

The law in Tennessee is clear that "when a servant deviates from his line of duty and engages in a mission of his own or for some third person, the master cannot be held [liable] under the rule of respondeat superior." ***Craig v. Gentry***, 792 S.W.2d 77, 79 (Tenn. Ct. App. 1990). We now extend this line of reasoning to situations involving "on call" employees. In determining whether an "on call" employee is acting within the course and scope of his employment, thus casting liability on his employer, we find the following factors helpful:

1. Whether, at the time of the accident, the employee's use of the vehicle benefitted the employer;

2. Whether the employee was subject to the employer's control at the time of the accident;

3. Whether the employee's after-hour activities were restricted while on call;

4. Whether the use of the vehicle at the time of the accident was authorized by the employer; and

5. What the employee's primary reason for using the vehicle was at the time of the injury-producing accident.

This list is not meant to be exclusive but is rather provided for guidance in future cases. It should be remembered, however, that the primary focus should be on whether the use of the vehicle at the time of the collision was within the course and scope of employment, and, as the ***Johnson*** court stated, each case should be determined upon its unique facts.

In the instant case, Eddie Sellers was driving the Ford F-150 pickup truck for the sole purpose of going to look at golf clubs with Mr. Thurmon and Dalton. At the time of the accident, he had not been called to perform a service for Donnie's Deli and Amoco, nor was he furthering the business of Donnie's Deli and Amoco. Accordingly, Eddie Sellers' use of the pickup truck at the time of the accident did not, in any way, benefit Mr. Sellers.

Mr. Sellers, as well as Eddie, testified that Eddie had complete control over the use of the pickup truck. Eddie did not have to ask permission to use the vehicle, nor did Mr. Sellers restrict Eddie's use of the truck in any manner. Donnie's Deli and Amoco did not put restrictions on the distances that could be driven nor did it limit the scope of what the truck could be used for. Additionally, Eddie was not restricted in what he could do while "on call." Rather, Mr. Sellers and Eddie testified that Eddie was free to engage in personal activities while he was on call at Donnie's Deli and Amoco. Based on this uncontraverted evidence, this Court finds that Eddie Sellers and his

use of the pickup truck were not subject to the control of Mr. Sellers d/b/a Donnie's Deli and Amoco at the time of the accident.

For all practical purposes, the Ford F-150 pickup truck leased by Mr. Sellers was Eddie's for use by him in whatever manner he saw fit. Mr. Sellers did not require that Eddie use the vehicle solely to carry out the needs of Donnie's Deli and Amoco. Rather, Mr. Sellers intended that Eddie use the truck as his own personal vehicle, whether that meant using the pickup for personal endeavors or in furtherance of the business of Donnie's Deli and Amoco. Because Mr. Sellers was Eddie's father as well as his employer at the time of this accident, it is difficult for this Court to say with certainty that Eddie's use of the pickup truck was authorized by Mr. Sellers as Eddie's employer. Mr. Sellers indeed testified that he did not restrict Eddie's use of the pickup truck. Additionally, the evidence in the record demonstrates that Eddie was not restricted in his activities while he was "on call" because he could always be reached by the cell phone provided by Donnie's Deli and Amoco. However, does that reasoning support a determination that Eddie's use of the pickup truck for personal endeavors during his "on call" hours was, in fact, authorized by Donnie's Deli and Amoco? Based upon these facts, we determine that while Eddie's *use* of the pickup truck for personal endeavors was authorized, this particular trip was not specifically authorized.

In ***Tennessee Farmers Mutual Insurance Company***, 840 S.W.2d at 938-39, this Court analyzed when a trip could be considered within the scope of employment, and it determined that if the trip would have taken place, regardless of the business reasons, then the trip is personal in nature and is not within the scope of employment. In contrast, if the trip would require the employer to send another employee to perform the same function if the trip had not been made or if the trip is authorized by an employer for business purposes and the employee has not deviated therefrom, then the trip is business in nature and is within the scope of employment. Here, Eddie's trip was solely for personal reasons - going to look at golf clubs with Mr. Thurmon and Dalton. As such, his trip was personal in nature and outside of the scope of his employment. Based upon the foregoing, it is the opinion of this court that, as a matter of law, Mr. Sellers is not vicariously liable for the act of Eddie Sellers because the injury-producing activity was beyond the scope of Eddie's employment. To hold otherwise would extend the doctrine of respondeat superior to unimaginable and inequitable lengths.

### Family Purpose Doctrine

The appellants in this action allege that Mr. Sellers is vicariously liable for the acts of Eddie Sellers based upon the family purpose doctrine because Mr. Sellers, as head of the Sellers' household, maintained the pickup in question for the purpose of providing pleasure or comfort for his family and that Eddie Sellers was using the pickup at the time of the accident in furtherance of that purpose and with the permission of Mr. Sellers. The family purpose doctrine is a court-created legal fiction by which the owner of an automobile is held vicariously liable when the car is negligently driven by a member of the immediate household. The fiction is predicated on the assumption that the driver is implementing a "family purpose," even if the driver is only using the automobile for his own pleasure or convenience. The car must be driven with the permission of the

owner, but this may be inferred from very general circumstances. The family purpose doctrine was adopted by the Tennessee Supreme Court in *King v. Smythe*, 204 S.W. 296 (Tenn. 1918), and was recently addressed in *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996).

In order for the family purpose doctrine to apply in Tennessee, two requirements must be met, namely, that the head of the household maintains the vehicle for the purpose of providing pleasure or comfort to his or her family and that the driver was using the vehicle at the time of the injury-producing accident in furtherance of that purpose and with either the express or implied permission of the owner. *See Camper*, 915 S.W.2d at 447. The true test is whether the driver was engaged in the owner's business at the time of accident, with business here meaning the furnishing of pleasure to the owner's family. *See Scates v. Sandefer*, 44 S.W.2d 310, 311-12 (Tenn. 1931). The family purpose doctrine applies to adults as well as to minors and is imposed as a matter of public policy. *See Scates*, 44 S.W.2d at 311; *Camper*, 915 S.W.2d at 448.

*King v. Smythe*, 204 S.W. 296 (Tenn. 1918), is analogous to and is controlling of the instant action. In *King*, a twenty-four year old son was involved in an accident while driving the family's vehicle which was owned and maintained by the father. The son was a medical student at the time and was residing in his father's residence rent-free. The son had the liberty to use the car, without having to ask for specific permission, as long as the vehicle was not needed by the father. At the time of the accident, the son was using the vehicle for his own personal pleasure. *See id.* at 296-97. Imposing liability on the father under the family purpose doctrine, the *King* court reasoned that "[i]f a father purchases an automobile for the pleasure and entertainment of his family, and . . . gives his adult son, who is a member of his family, permission to use it for pleasure, except when needed by the father, it would seem perfectly clear that the son is in the furtherance of this purpose of the father while driving the car for his own pleasure." *Id.* at 298.

The trial court ruled for Mr. Sellers on this issue, finding that Eddie was not using the pickup in furtherance of the purpose and with the permission of Mr. Sellers. (TR, V5, p.207). On appeal, the Sellers assert this same argument, contending that Eddie Sellers was carrying out the business of Mr. Thurmon rather than that of his father. We disagree. In *Scates v. Sandefer*, the Tennessee Supreme Court had the responsibility of determining whether the driver was about the vehicle owner's business for purposes of liability under the family purpose doctrine. We believe a discussion of that case is warranted here.

In *Scates*, a nineteen year old son took a job with a feed company, and, as part of his written employment contract, he was required to furnish his own vehicle to further his duties as a salesman. His father, the vehicle owner, gave his son his car to use in the execution of his employment contract. The son lived with the father, and when the car was not being used in the son's business, it was used by family members for pleasure. On the day of the accident, the son's employer required the son to use the car to drive the employer's prospective customers to the country. It was during the course of this trip that the accident occurred. Based upon these facts, the supreme court held that the father was not liable under the family purpose doctrine because the vehicle "was not being operated in the business of the father nor for the pleasure and comfort of himself or family, but solely

in behalf of the feed company, and in strict compliance with the contract made between the parties." *Scates*, 44 S.W.2d at 311. The facts of the instant case are readily distinguishable from the facts in *Scates*. Here, Eddie Sellers was using the vehicle on the day of the accident, for a purely personal purpose - driving himself and his friends, Mr. Thurmon and Dalton, to Memphis to look at golf clubs. Mr. Thurmon did not employ Eddie to drive him to Memphis, nor was Eddie bound by a written contract to drive Mr. Thurmon anywhere he desired to go as was the defendant in the *Scates* case. Even though Eddie was utilizing the pickup for the desires of Mr. Thurmon, the distinction lies with the fact that Eddie was not *required* to use the pickup to take Mr. Thurmon and his son to Memphis. Instead, when Eddie and Mr. Thurmon discussed who would drive, Eddie persuaded Mr. Thurmon that he would drive. Based upon this, it is clear that, by driving the pickup truck, Eddie was furthering his own desire - that of driving and accompanying his friends on their quest to find golf clubs.

Because the trial court ruled on this issue in favor of the Sellers, we need only determine whether the evidence makes out a prima facie case. *See Smith*, 846 S.W.2d at 822.

The evidence introduced at trial was uncontradicted. Mr. Sellers established himself as the head of the Sellers' household. He further testified that he leased the pickup truck for use by Eddie in the business of Donnie's Deli and Amoco, as well as for Eddie's personal use. Mr. Sellers did not restrict Eddie's use of the vehicle, and Eddie did not have to ask for specific permission to use the vehicle when he desired. In fact, Eddie had the liberty to use the vehicle whenever he desired. It is clear, based upon the evidence in the record, that Eddie was using the pickup truck at the time of the accident with implied permission and in furtherance of his own pleasure, which in turn furthered the purpose for which Mr. Sellers' leased the vehicle. Thus, the requirements of the family purpose doctrine are met and said doctrine applies to this case. Accordingly, we reverse the trial court's holding as it pertains to this issue and conclude that Mr. Sellers is vicariously liable for the acts of Eddie Sellers based upon the family purpose doctrine. This cause is remanded to the trial court for entry of judgment against Mr. Sellers in accordance with this opinion.

### *Loss of Consortium*

Mrs. Scott filed her wrongful death action giving rise to this appeal in November of 1996, less than two months after the death of her son, Dalton. Mrs. Scott amended her complaint in February of 1999 to include an additional claim for loss of consortium under Tennessee's wrongful death statute pursuant to the Tennessee Supreme Court's January 25, 1999 opinion in *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999). The Sellers argue that Mrs. Scott does not have a claim because *Jordan* cannot be applied retroactively, citing this Court's decision in *Hill v. City of Germantown*, No. 02A01-9803-CV-00078, 1999 WL 142386, at *1 (Tenn. Ct. App. Sept. 20, 1999), as support for this position. In *Hill*, we reasoned that *Jordan* changed the judicial construction of Tennessee's wrongful death statute which then became part of the statute itself and had the same effect as changing the law by legislation. *See Hill*, 1999 WL 142386, at *10 (citing *Blank v. Olsen*, 662 S.W.2d 324, 326 (Tenn. 1983)). We further reasoned that a change in the judicial construction of a statute should not be applied retroactively. *See id.* at *11. The

Tennessee Supreme Court granted permission to appeal our decision in *Hill*, and on October 20, 2000, it rendered its opinion.

One of the issues on appeal in *Hill* was whether *Jordan* could be applied retroactively. The supreme court noted the holding in *Blank v. Olsen*, 662 S.W.2d 324 (Tenn. 1983), which stated that "in the absence of . . . an expressed intent [to make it retroactive,] the rule is . . . that the decision overruling a judicial construction of a statute will not be given retroactive effect." *See id.* at 325. The supreme court then stated that the absence of language giving *Jordan* retroactive effect was "a product of oversight rather than the result of a judicial decision to limit *Jordan* to prospective application only." *See Hill v. City of Germantown*, 31 S.W.3d 234, 240 (Tenn. 2000). The Tennessee Supreme Court then expressed its desire that *Jordan* be applied retroactively by holding that "*Jordan* applies retroactively to: (1) all cases tried or retried after the date of our decision in *Jordan* [January 25, 1999]; and (2) to all cases pending on appeal in which the issue decided in *Jordan* was raised at an appropriate time." *Id.* Based upon the supreme court's holding in *Hill*, we find that the Sellers' argument must fail and find that, indeed, *Jordan* applies retroactively to this case. Now, we must turn to the issue of whether Mrs. Scott can successfully assert a claim for loss of consortium for the death of her minor child, Dalton.

Under Tennessee law, an action for wrongful death is statutory in nature, and recoverable damages must be determined by reference to the statute involved. *See Jordan*, 984 S.W.2d at 597; Tenn. Code Ann. §§ 20-5-101 to -120 (1994). Section 20-5-113 of the Tennessee Code provides as follows for the damages recoverable in a wrongful death action:

> Where a person's death is caused by the wrongful act, fault, or omission of another, and suit is brought for damages, as provided for by §§ 20-5-106 and 20-5-107, the party suing shall, if entitled to damages, have the right to recover for the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received.

Tenn. Code Ann. § 20-5-113 (1994). Under this section, survivors of the deceased may recover for their losses suffered as a result of the death as well as the damages sustained by the deceased from the time of injury to the time of death. Because of such language, the *Jordan* court classified Tennessee's wrongful death statute as a hybrid between traditional survival and wrongful death statutes. *See Jordan*, 984 S.W.2d at 598. In *Davidson Benedict Co. v. Severson*, 72 S.W.2d 967, 982 (Tenn. 1903), the Tennessee Supreme Court held that our wrongful death statute does not provide for recovery of consortium damages. This was the standard in Tennessee until the supreme court's decision in *Jordan*.

In *Jordan*, the Tennessee Supreme Court revisited the issue of whether consortium-type damages were recoverable under our wrongful death statute. The *Jordan* court determined that section 20-5-113 of the Tennessee Code provided for a cause of action to compensate survivors for

incidental damages sustained as a result of the injured party's death. *See Jordan*, 984 S.W.2d at 600. Included in those incidental damages is the pecuniary value of the decedent's life which the court defined as "the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry." *See id.* (citations omitted). Further, the court determined that the pecuniary value of a human life is also comprised of the value of human companionship. *See id.* The *Jordan* court then refined the term "pecuniary value" to include consortium-type damages, which it determined consisted of "several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations." *Id.* at 602. With its holding, the *Jordan* court reversed the standard set by *Davidson Benedict Co.* and held that Tennessee's wrongful death statutes allowed surviving spouses and children of the deceased to sue for loss of consortium. *See id.* at 601. The *Jordan* court, however, declined to address whether consortium damages may be recovered by parents in the event of the loss of their child (filial consortium), stating "[t]hat issue will be addressed in an appropriate case." *Id.* at 596. Because *Jordan* applies retroactively to this case, as it was tried after January 25, 1999, and because the loss of consortium issue was timely raised at the trial level, this is an appropriate case to decide whether a parent may recover damages for filial consortium pursuant to Tennessee's wrongful death statute. Because this is a case of first impression in Tennessee, we must look to the decisions of our sister jurisdictions for guidance.

Although "consortium" historically denoted the loss of an injured spouse's services and society, it recently has been broadened to encompass general notions of comfort, support and companionship in the parent-child relationship, as well as in the spousal relationship. Today, most jurisdictions allow for recovery of filial consortium damages in wrongful death actions for the death of a child.[7] After a careful review of cases from courts allowing recovery of filial consortium

---

[7]Recovery is expressly permitted by statute in the following states: Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, North Carolina, Ohio, Oklahoma, Virginia, Washington, and Wisconsin. *See Robinson v. Wroblewski*, 704 N.E.2d 467 (Ind. 1998); *Pagitt v. Keokuk*, 206 N.W.2d 700 (Iowa 1973); *Kurdziel v. Van Es*, 306 P.2d 159 (Kan. 1957); *Department of Ed. v. Belvins*, 707 S.W.2d 782 (Ky. 1986); *Carolina Freight Carriers Corp. v. Keane*, 534 A.2d 1337 (Md. 1988); *Guy v. Johnson*, 448 N.E.2d 1142 (Mass. 1983), *review denied by* 452 N.E.2d 1158; *Crystal v. Hubbard*, 324 N.W.2d 869 (Mich. 1982); *Bowen v. Constructors Equip. Rental Co.*, 196 S.E.2d 789 (N.C. 1973); *Keaton v. Ribbeck*, 391 N.E.2d 307 (Ohio 1979); *Clark v. Jones*, 658 P.2d 1147 (Okla. 1983); *Modaber v. Kelley*, 348 S.E.2d 233 (Va. 1986); *Wilson v. Lund*, 491 P.2d 1287 (Wash. 1971); *Shockley v. Prier*, 225 N.W.2d 495 (Wis. 1975).

Recovery is permitted pursuant to statutory language (i.e. "general loss" or "pecuniary loss") in the following states: Alaska, Arizona, California, Idaho, Illinois, Louisiana, Minnesota, Mississippi, Montana, Nebraska, New Jersey, New York, North Dakota, South Carolina, South Dakota, Texas, Utah, and Vermont. *See Gillispie v. Beta Constr. Co.*, 842 P.2d 1272 (Alaska 1992); *Frank v. Superior Court*, 722 P.2d 955 (Ariz. 1986); *Perry v. Medina*, 237 Cal. Rptr. 532 (5th Dist. 1987); *Checketts v. Bowman*, 220 P.2d 682 (Idaho 1950); *Bullard v. Barnes*, 468 N.E.2d 1228 (Ill.1984); *Vincent v. Morgan's L. & T.R. & S.S. Co.*, 74 So. 541 (La. 1917); *Fussner v. Andert*, 113 N.W.2d 355 (Minn. 1961); *Louisville & N.R. Co. v. Whisenant*, 58 So. 2d 908 (Miss. 1952); *Davis v. Smith*, 448 P.2d 133 (Mont. 1968); *Selders*

(continued...)

-13-

damages, this court is of the opinion that Tennessee should join the vast number of jurisdictions allowing such recovery in wrongful death actions. It would be anomalous for us to deny parents recovery for the loss of their child's society in wrongful death actions when we have previously allowed for a similar recovery when the loss of a parent and of a spouse was involved pursuant to our wrongful death statute. *See Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593 (Tenn. 1999) (interpreting wrongful death statute to include recovery for spousal and parental consortium as part of incidental damages). Additionally, to allow for recovery of filial consortium is consistent with the analysis and holding in *Jordan*.

> First, such damages are not precluded by statute. Second, the modern trend in the law appears to be to allow such damages. Third, several of the same bases that support recovery for spouses and children, such as the value of a family member to the family as a functioning social unit, would appear to equally support recovery for parents.

*Alexander v. Beale St. Blues Co., Inc.*, 108 F. Supp.2d 934, 953 (W.D. Tenn. 1999) (internal citations omitted). Therefore, we hold that parents may recover consortium-type damages for the wrongful death of their child. Now we must determine what factors should be considered in computing those damages.

When recovery is based upon the pecuniary value of the decedent's life, the trier of fact must make this determination upon a consideration of several factors, including the decedent's life expectancy, age, condition of health and strength, capacity for labor and for earning money through skill in any art, trade, profession, and occupation or business. *See Hutton v. City of Savannah*, 968 S.W.2d 808, 811-12 (Tenn. Ct. App. 1997) (citing *Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn.1994)). That award should then be reduced by deducting the decedent's probable living expenses had the decedent lived. *See id.* (citing *Wallace v. Couch*, 642 S.W.2d 141, 144 (Tenn.1982)). In the case of a minor child, those living expenses are the costs associated with child-rearing. In the case of a very young child, estimates of the child's future earnings and contributions are speculative at best. *See generally Ahrenholz v. Hennepin County*, 295 N.W.2d 645, 648-49 (Minn. 1980). For this reason, it can be helpful to have expert testimony concerning the valuation of a child's pecuniary losses. *See Green v. Bittner*, 424 A.2d 210, 218 (N.J. 1980).

---

[7](...continued)
*v. Armentrout*, 207 N.W.2d 686 (Neb. 1973); *Green v. Bittner*, 424 A.2d 210 (N.J. 1980); *Saguid v. Kingston Hosp.*, 623 N.Y.S.2d 341 (N.Y. App. Div. 1995), *appeal dismissed*, 662 N.E.2d 793, *leave to appeal dismissed by* 667 N.E.2d 337 (1996); *Hopkins v. McBane*, 427 N.W.2d 85 (N.D. 1988); *Gomillion v. Forsythe*, 62 S.E.2d 297 (S.C. 1950); *Anderson v. Lale*, 216 N.W.2d 152 (S.D. 1974); *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983); *Jones v. Carvell*, 641 P.2d 105 (Utah 1982); *Clymer v. Webster*, 596 A.2d 905 (Vt. 1991).

Recovery is allowed under a type of common law standard in New Mexico. *See Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774 (N.M. 1998).

Pecuniary value also necessarily encompasses the value of human companionship. Therefore, in determining the amount of consortium damages, courts must also consider the benefits the child bestowed on the family, such as companionship, comfort, society, attention, cooperation, affection, care and love. Because it is impossible to generalize on the extent to which family members enjoy each other's companionship and society, the measurement of a particular parent's loss of a particular child's consortium must be decided on a case by case basis. It must be noted, however, that recovery of such losses are restricted to pecuniary losses, that is the actual monetary value of the life of the child. Thus, parents cannot recover for the sorrow and anguish endured as a result of the child's death. *See Wycko v. Gnodtke*, 105 N.W.2d 118, 123 (Mich. 1960).

At the conclusion of the proof, the trial court granted the Sellers motion to dismiss Mrs. Scott's claim for loss of consortium. In view of the fact that this matter was tried without the intervention of a jury, this cause, as it relates to Mrs. Scott's claim for loss of consortium, is remanded to the trial court for a determination of what additional damages, if any, Mrs. Scott is entitled to for the loss of consortium of her minor son. The trial court is instructed to include in such award an entry of judgment against Mr. Sellers in accordance with this opinion.

### *Wrongful Death Award*

Mrs. Scott contends that the trial court's award of $700,000 in damages pursuant to the wrongful death statute was insufficient and against the preponderance of the evidence. In reviewing nonjury verdicts, unless the evidence preponderates against the court's findings, we must affirm the trial court's judgment absent error of law. *See Squibb v. Smith*, 948 S.W.2d 752 (Tenn. Ct. App. 1997); Tenn. R. App. P. 13(d).

Section 20-5-113 of the Tennessee Code governs what damages are recoverable in wrongful death cases. That section provides for recovery of "the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received." Tenn. Code Ann. § 20-5-113 (1994).

At trial, Mrs. Scott introduced the expert testimony of Dr. John Knepper and of Dr. Thomas Depperschmidt. Dr. Knepper testified to the cause of Dalton's death and to the reasonableness and necessity of the medical bills incurred for Dalton's treatment. The amount of those medical bills was $8,807.55. Dr. Depperschmidt testified to the pecuniary value of Dalton's life. In arriving at a figure of $1,160,000, Dr. Depperschmidt based his conclusion on Dalton's parents' education and on the money income figures published by the Department of Commerce. Dr. Depperschmidt further included average fringe benefits for a typical worker in the $1,160,000 figure, but excluded personal maintenance costs which he assumed Dalton would incur based upon the assumption that Dalton would have married and have had two children. After hearing this evidence, the trial court awarded Mrs. Scott $700,000 for the wrongful death of her son, Dalton. Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony. *See Gibson v. Ferguson*, 562 S.W.2d 188, 189-90

-15-

(Tenn. 1976); ***England v. Burns Stone Co., Inc.***, 874 S.W.2d 32, 38 (Tenn. Ct. App. 1993). Further, the trier of fact may draw upon its common knowledge and may arrive at a conclusion contrary to the expert testimony. ***See England***, 874 S.W.2d at 38.

After carefully reviewing the record, we find that the trial court's award of $700,000 was supported by the evidence introduced at trial and was within the purview of section 20-5-113 of the Tennessee Code. Therefore, we find that the trial court's award was proper under these circumstances, and we affirm the trial court's judgment.

### *Negligent Infliction of Emotional Distress*

In raising the issue of whether the trial court erred in not dismissing Mr. Fuhs' claims for negligent infliction of emotional distress, the Sellers contend that Mr. Fuhs has no basis for such a claim because he is unable to meet the requirements established in ***Ramsey v. Beavers***, 931 S.W.2d 527 (Tenn. 1996). We disagree with the Sellers' interpretation of ***Ramsey*** and their assertion that Mr. Fuhs does not have a basis for his negligent infliction of emotional distress claim.

After a long history of confusing and unpredictable law as it concerned negligent infliction of emotional distress, the Tennessee Supreme Court established the factors required to make out a prima facie case for negligent infliction of emotional distress in its opinion in ***Camper v. Minor***, 915 S.W.2d 437 (Tenn. 1996). There, the court held that such cases should be analyzed under the general negligence approach whereby the plaintiff must present evidence as to duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause. ***See id.*** at 446. In order to recover for emotional injuries, the plaintiff must prove two things: (1) that the defendant's negligence in fact caused the third person's injuries or death and the plaintiff's emotional injury; and (2) that the third person's injury or death and the plaintiff's emotional injury were the proximate and foreseeable results of defendant's negligence. ***See id.*** Further, the ***Camper*** court held that recovery is allowed only where the plaintiff suffered serious or severe emotional injuries, which occurs when "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case," and that the claimed injury must be supported by expert medical or scientific proof. ***Id.*** (citations omitted).

With its holding, the ***Camper*** court did not necessarily abandon the "zone of danger" approach to negligent infliction of emotional distress cases. Instead, the court determined that the principles of the "zone of danger" approach should be incorporated into a case's analysis as a way of defining and limiting the elements of duty and proximate cause. ***See id.*** at n.2. The ***Camper*** court, however, reserved the specifics of such incorporation for discussion in a later case. That later case was ***Ramsey v. Beavers***, 931 S.W.2d 527 (Tenn. 1996).

In ***Ramsey***, the Tennessee Supreme Court determined that the principles of the "zone of danger" approach were helpful in determining foreseeability. The court opined that establishing foreseeability required consideration of three factors, namely, (1) the plaintiff's physical location at

the time of the accident and his awareness of the accident, (2) the seriousness of the injury to the third party, and (3) the plaintiff's relationship to the injured third party. *See id.* at 531.

On appeal, the Sellers argue that *Ramsey* stands for the proposition that a plaintiff *must* prove all three factors in order to establish foreseeability. A careful reading of *Ramsey* insists otherwise. The *Ramsey* court requires consideration of a number of relevant factors of which the plaintiff's location at the time of the event and his awareness of the accident are considered essential. Because these two factors are considered essential for the determination of foreseeability, the court explained that the plaintiff *must* establish that he was sufficiently close to the event to allow for sensory observation and that the injury to the third party was, or was reasonably perceived to be, serious or fatal. Although the court recognized that most jurisdictions require the plaintiff to have a close relationship with the third party, it did not expressly state that a plaintiff in Tennessee must have had a close relationship with the third party in order to establish foreseeability. To hold that *Ramsey* requires proof of all three factors before foreseeability can be established would be contrary to *Camper v. Minor* as the plaintiff in that case was a complete stranger to the third party but yet was allowed to recover his damages for negligent infliction of emotional distress. Furthermore, in applying *Ramsey*, we held in *McCrackin v. City of Millington*, 1999 WL 142391, at *1 (Tenn. Ct. App. Mar. 17, 1999), that "[i]n determining whether the plaintiff's emotional injury was foreseeable, the trier of fact *should* consider (1) the plaintiff's physical location at the time of the injury-producing event as well as the plaintiff's awareness of the injury-producing event, (2) the seriousness of the third party's injury, and (3) the nature of the plaintiff's relationship with the injured third party." *Id.* at *10 (emphasis added). As concerns the third factor, we believe that the nature of the plaintiff's relationship with the third party should play a pivotal role in determining the *amount* of damages to award, rather than being a prerequisite for establishing foreseeability as the Sellers suggest.

In the instant action, Eddie Sellers had a duty to drive his vehicle within the bounds of the law. By not remaining stopped at the stop sign, Eddie breached this duty. As a result of this breach, an accident occurred which injured Mr. Fuhs, Mr. Thurmon, and fatally injured Dalton. It was conceded at trial that Eddie was the cause in fact and the proximate cause of the accident which killed Dalton. Mr. Fuhs further testified that he suffered emotionally as a result of witnessing the accident caused by Eddie and of subsequently witnessing what he perceived to be Dalton's lifeless body. Regarding foreseeability, although Mr. Fuhs was not related to nor did he have a close relationship with any of the occupants of Eddie's pickup truck at the time of the accident, Mr. Fuhs witnessed, from a few feet away, Dalton's body slumped over the back seat of the pickup truck and hanging halfway out of the truck's back window. Mr. Fuhs testified that he thought Dalton was dead at the accident scene, but expert testimony established that Dalton, in fact, died several hours after the accident while in the hospital.

Mr. Fuhs sought treatment from a psychologist for anxiety, sleeping problems, and flashbacks. At trial, Mr. Fuhs introduced expert testimony establishing that he has a permanent impairment of 12% to the body as a whole from his physical injuries and of 55-75% to the body as a whole from his mental distress related to this accident. Based upon the foregoing, we conclude that

Mr. Fuhs was successful in establishing a prima facie case for negligent infliction of emotional distress under *Camper v. Minor* and *Ramsey v. Beavers*. Thus, the trial court did not err in denying the Sellers' motion to dismiss Mr. Fuhs' claim for negligent infliction of emotional distress.

### *Damages Award*

The Sellers contend that the trial court's award of $275,000 to Mr. Fuhs was beyond the range of reasonableness and must be set aside. In accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, a trial court's findings of fact and its judgment in a bench-tried case must be affirmed, unless the evidence preponderates against the court's findings, absent an error of law. *See Squibb v. Smith*, 948 S.W.2d 752 (Tenn. Ct. App. 1997); Tenn. R. App. P. 13(d).

At trial, Mr. Fuhs offered lay and expert testimony and an analysis of the damages he sustained as a result of this accident. A synopsis of those damages follows.

| | |
|---|---|
| Medical Expenses | $9,224.94 |
| Property Losses | $41,430.00 |
| Income Losses | $44,544.13 |
| Future Income Losses | $269,787.56 |
| Total | $364,986.63 |

Additionally, Mr. Fuhs was diagnosed as having a total permanent impairment of 12% to the body from his physical injuries and of 55-75% to the body from his mental distress. Based upon the evidence introduced at trial, the trial court awarded Mr. Fuhs $275,000 in damages, finding that Mr. Fuhs "did experience some nonphysical injury that should be considered in making an award in his situation." After carefully reviewing the record, we find that the evidence supports the trial court's award to Mr. Fuhs and that no error of law was committed by the trial court in making its award. Accordingly, we affirm the amount of the verdict in favor of Mr. Fuhs, but we remand this issue to the trial court for entry of judgment against Mr. Sellers, as well as Eddie Sellers, in accordance with our holding that Mr. Sellers is vicariously liable for the acts of Eddie Sellers under the family purpose doctrine.

### *Conclusion*

Based upon the foregoing, we hold that, as a matter of law, Mr. Sellers is not vicariously liable for the acts of Eddie Sellers under the doctrine of respondeat superior. Mr. Sellers is, however, vicariously liable for the damages incurred by the plaintiffs as a result of the collision caused by his son, Eddie Sellers, under the family purpose doctrine. Hence, we affirm the trial court's ruling as it concerns the issue of respondeat superior, but we reverse the ruling as it concerns the family purpose doctrine. Accordingly, we remand this issue to the trial court for entry of judgment against Mr. Sellers and in favor of all plaintiffs in accordance with our holding in this opinion.

We hold that Tennessee is to join the majority of jurisdictions allowing for recovery of filial consortium damages in a wrongful death action for the death of a child pursuant to our wrongful death statute and to the Tennessee Supreme Court's holding in *Jordan v. Baptist Three Rivers Hospital*. Recovery is limited to pecuniary losses which are to be reduced by the amount of child-rearing expenses projected to have been incurred by the parents. Recovery may not be had for the grief and anguish suffered by the parents as such loss is not monetary in nature. For the foregoing reasons, we remand this cause to the trial court for a determination of what additional damages, if any, Mrs. Scott is entitled to for the loss of consortium of her minor son. The trial court is instructed to include in such award an entry of judgment against Mr. Sellers in accordance with this opinion.

We hold that the trial court's award of $700,000 to Mrs. Scott on her wrongful death claim was supported by the evidence and is thus affirmed.

We find that Mr. Fuhs sufficiently established his claim for negligent infliction of emotional distress, and the trial court correctly denied the Sellers' motion to dismiss this claim. The trial court's judgment on this issue is affirmed. Additionally, we uphold the amount awarded to Mr. Fuhs as proper, but we remand this issue for the entry of judgment against Mr. Sellers in accordance with this opinion.

Accordingly, we affirm in part, reverse in part, and remand this case to the trial court for entry of judgment consistent with this opinion. The costs of this appeal are taxed equally to the appellants, Dana Hope Davis Thurmon Scott, Shane and Tiffany Thurmon, and Carl J. Fuhs, and to the appellees, Eddie Sellers and Donald E. Sellers, Sr., and their sureties, for which execution may issue if necessary.

 

 

 

_____

DAVID R. FARMER, JUDGE